Dear Ms. Morris:
On behalf of Doug Welborn, Clerk of Court, East Baton Rouge Parish, you have asked this office to review the attached questionnaires and advise whether the documents are in violation of the Louisiana Election Code prohibition against electioneering. Those prohibited activities are set forth in R.S.18:1462, providing:
 § 1462. Acts prohibited on election day; electioneering; intimidation; exceptions; enforcement; penalties
 A. The Legislature of Louisiana recognizes that the right to vote is a right that is essential to the effective operation of a democratic government. Due to a past, longstanding history of election problems, such as multiple voting, votes being recorded for persons who did not vote, votes being recorded for deceased persons, voting by non-residents, vote buying, and voter intimidation, the legislature finds that the state has a compelling interest in securing a person's right to vote in an environment which is free from intimidation, harassment, confusion, obstruction, and undue influence. The legislature, therefore, enacts this Subsection to provide for a six hundred foot campaign-free zone around polling places to provide to each voter such an environment in which to exercise his right to vote. Except as otherwise specifically provided by law, it shall be unlawful for any person, between the hours of 6:00 a.m. and 9:00 p.m., to perform or cause to be performed any of the following acts within any polling place being used in an election on election day or within any place wherein absentee voting is being conducted, or within a radius of six hundred feet of the entrance to any polling place being used in an election on election day or any place wherein absentee voting is being conducted: (1) To solicit in any manner or by any means whatsoever any other person to vote for or against any candidate or proposition being voted on in such election.
 (2) To remain within any such polling place or place wherein absentee voting is being conducted or within a radius of six hundred feet of the entrance of any such polling place, except when exercising the right to vote, after having been directed, in writing, by an election commissioner or law enforcement officer to leave the premises or area of a polling place or after having been directed, in writing, by a registrar or deputy registrar to leave the place wherein absentee voting is being conducted.
 (3) To hand out, place, or display campaign cards, pictures, or other campaign literature of any kind or description whatsoever.
 (4) To place or display political signs, pictures, or other forms of political advertising.
 B. The provisions hereof shall not apply to the placing and displaying, either by the owner, lessee, or lawful occupant thereof, or with the consent of such owner, lessee or occupant, of political signs or pictures on private property which is not being used as a polling place.
 C. The provisions of this Section shall not be construed as prohibiting any appointed election commissioner or any official watcher from remaining in and about the polling place in which he was selected to serve. However, no appointed election official shall wear any badge, button, pin, or other insignia identifying him with any political candidate or faction, nor shall any such official in any manner attempt to influence any voter to vote for or against any candidate or proposition being voted on in the election being held in that polling place nor shall any such official carry or possess a firearm while present in the polling place.
D. No person shall:
 (1) Possess any beverage of alcoholic content in a polling place after having been directed by a commissioner or law enforcement officer assisting at the polls to remove or dispose of the beverage.
 (2) Appear at a polling place in an intoxicated condition.
 (3) Intimidate a person by the use of violence, force, or threats with the intent to influence that person's decision to vote or to impede such person's ingress or egress from a polling place.
 E. The duly constituted law enforcement officers of the political subdivision in which any such election is being held shall enforce the provisions of this Section when requested to do so by the commissioners. The election commissioners at the several polling places likewise shall enforce the provisions of this Section. These law enforcement officers and commissioners are authorized to seize, remove, and destroy any political cards, signs, pictures, or literature being used or displayed in violation of any of the provisions hereof.
 F. Whoever violates any provision of this Section shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both. On a second offense or any succeeding offense, the penalty shall be a fine of not more than one thousand dollars or imprisonment for not more than one year, or both.
The general term "exit poll" refers to the collecting of data from a random sample of voters at a sample of polling places on primary and general election days. In conducting exit polls, exit pollsters approach voters after they have voted and ask them to complete a short anonymous questionnaire. The questionnaire asks voters for demographic information and their opinions on issues of the day. Participation is voluntary; if the voter agrees to complete the questionnaire, he or she is given a pencil, asked to mark their answers, and fold and deposit the completed questionnaire in a ballot box that is carried by the interviewer. Again, the voter's name is not on the questionnaire.
At this juncture, we note that federal and state courts have struck down every exit poll restriction challenged by the media. In Daily Herald vs. Munro, 838 F.2d 380 (9th Cir. 1988), the court held a 300-foot restriction on exit-polling to be unconstitutional on its face. The court in Daily Herald,supra, voted that the taking of an exit poll is protected by the First Amendment because it involves citizens discussing their political choices. "A major purpose of the First Amendment was to protect the free discussion of governmental affairs. . . . this of course includes the discussion of candidates." Id at 384. Further, the court stated "the First Amendment protects the media's right to gather news." Id at 384.
Numerous other cases have struck down statutory restrictions on exit polling. See CBS v. Smith,681 F. Supp. 794, 803 (S.D. Fla. 1988) (striking down exiting poll restriction because "newsgathering is a basic right protected by the First Amendment"); NBC v. Colburg, 699 F. Supp. 241, 242 (D. Mont. 1988), ([g]athering and dissemination of information concerning why and how people vote constitutes speech which is protected by the First Amendment"); NBC v. Cleland, 697 F. Supp. 1204, 1210
(N.D. Ga. 1988) ("because [the statute] restricts the freedom to speak about elections, government and politics, and statute strikes at the very core of the First Amendment"); Firestone v.News-Press Publishing Co., 538 So. 2d 457, 459 (Fla. 1989) (state failed to substantiate claims that exit polling disrupted voting).
The opinions issued by this office reflect the holdings of the jurisprudence cited above. In Attorney General Opinion 80-1303, the author stated "the provisions of the Louisiana Election Code, specifically R.S. 18:1462, that would be applicable to the regulation of proscribed activities within [600] feet of polling places on election day do not prohibit legitimate news gathering activities by the media. The conducting of interviews for polling purposes by the media would not constitute loitering, electioneering or the type of prohibited activity outlined in R.S. 18:1462".
Similarly, in Attorney General Opinion 83-657 this office concluded "the news media may conduct interviews, within a six hundred foot radius of a polling place, with persons who have already voted."
Your concern is the appropriateness of the questions presented by the survey. We have reviewed the sample surveys which include demographic questions and questions concerning support for the war or economic policies, whether or not the individual considers himself or herself a liberal, moderate, or conservative, and whether or not the individual is a member of the conservative Christian political movement.
We find these questions to be acceptable. The media uses the results of exit polls to "analyze how and why people vote, to identify and comment upon social and political trends . . . . . . policy judgments underlying [a voter's] voting choices are made with unique reliability by exit polls." See National BroadcastingCompany, Inc. vs. Cleland, 697 F. Supp. 1204 (N.D. Georgia 1988) at 1208. These are the types of questions prompting responses which reflect current social and political trends.
Finally, because we consider the surveys to be acceptable questionnaires for purposes of exit polling, it matters not that the precinct is located on private property. R.S. 18:533 dictates that in this instance "the governing authority shall enter into a written lease for such property which lease shall state that the property is to be used as a polling place for a specified precinct" and also that "the word `premises' as used in this Subsection includes lands, private ways, buildings, and structures which are being used as a polling place, or used as access to a polling place, on any election day". See R.S.18:533(E) and R.S. 18:533(F)(4). Exit polls conducted by the media are permissible within 600 feet of the polling place, whether the polling place is located in a public building or upon private property leased by the public entity involved.
We hope the foregoing is helpful to you. Should you have other questions in which we may provide assistance, please contact this office.
Very truly yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 BY: ___________________________________ KERRY L. KILPATRICK Assistant Attorney General